Our first case of the morning is 14-0555 Kotynek v. Carle Clinic Association for the Appellee. Mr. Emmons, you may proceed. Thank you, Your Honor, Counsel. I have about three minutes, I believe. This is a breach of contract case. The parties agree that the bylaws constituted an enforceable contract. We're not in agreement on which set of bylaws govern. Dr. Kotynek attached bylaws to his complaint as required under the law. Defendant has admitted that he did not pay Dr. Kotynek as required under the bylaws. There was a requirement after which Dr. Kotynek became disabled that he be paid within 30 days of being informed of such. This was a breach. Carle or defendant, appellee, refers to this breach as being technically untimely. We're talking not about a one or two day deal. We're talking about over a year delay and only after threat of litigation came about. Let me see if I understand. Their position is once he became fully disabled, if I understand their position, that automatically according to the contract he stopped being a shareholder and he was entitled to his money. That is their argument, yes. And your position is because they didn't pay within 30 days, what? That the contract is breached as is all portions of the contract including the valuation formula that set forth that his shares would be worth X or $48,000 in this situation. The complicating factor after the breach occurred, Carle Foundation Hospital, a not-for-profit, hindered an offer for the shares of the shareholders and they went from a $48,000 value up to nearly a million. But under your theory, if I understand correctly, because they didn't pay within 30 days, he could continue if he wished as a shareholder. He doesn't have to sell at all. That's correct. Or he could move from a Class A shareholder to a Class B shareholder as set forth under Section 2.3 of our bylaws. The court didn't address that, but there were some statements in the affidavits that suggested that those had been amended. Now, we dispute that, but nevertheless, that's the problem. I think probably just to summarize this is, I look at it as an analogy like this. Two parties enter into a contract to buy and sell a home. The proposed buyer defaults, does not pay for the house. Six months, a year later, gold is discovered on that property and the original buyer would re-approach the seller and say, I'd like to go ahead and pursue this purchase and the purchase price is set forth in the contract that we have breached. Now, I argue that contract is over. Now, if nothing else, even if he couldn't become a member because he's disabled, which I say that's invalid now because they breached, he's at least entitled to be paid a fair market value for the value of those shares that they didn't purchase. Why isn't this just a matter of a claim for what he is due in owing, including interest on that or some other penalty or liquidated damages? Why does it mean the whole contract? Well, his other option, of course, was to become a Class B shareholder under Section 2.3 of the bylaws. Now, they want to ignore that portion, but that is his other option. To become a Class B shareholder and he wouldn't have the same voting rights as a Class A shareholder, but that was his other option. How would that have occurred? What would need to happen for that to occur? He becomes disabled and then they would have tendered an offer to buy and he would have then submitted a request to become a Class B shareholder. And then the shares that he held, in your view, would just have been converted to? To Class B shareholders under 2.3 of the contract, yes. And what result then? Well, and that's all outlined that he would have been able to hold those shares for up to 10 years, per the language of the bylaws. And then, of course, what happened is in the intervening time, a suitor came to purchase the organization and he would have been able to sell just like any other shareholder. So he had to take some action to change it from a Class A to a Class B? Well, I think yes. He would have had to at that point, after they tendered an offer to purchase his shares, then he would have been required to say, no, I choose to become a Class B shareholder. Now there's a dispute as to whether or not that section was or was not amended. Our complaint contains that the bylaws that we say are enforceable. And so that's where the parties are not in agreement. I'm not sure I understand the last part. Well, subsequently, the defendants filed affidavits stating that the bylaws had been amended and they had changed that portion. Now we don't know the date. We don't know the vote. We don't know anything. But whether or not that would be applicable to Dr. Katynik is unknown. What we included was the contract language in the copy of the bylaws. They say, no, no, we have now changed Section 2.3 and he couldn't do that. We don't know if that's correct or not, but we weren't allowed to pursue discovery at all either on that matter. They attached affidavits and we requested to depose those under the Supreme Court rule. And we were not allowed to do that under Rule 191. So your first position is they remain Class A shares and I ought to get the $900,000? Yes. Your second position is no matter what, given that you didn't tender the repurchase price within 30 days, that didn't give us the opportunity to respond to your repurchase price by saying, eh, I'd rather have the Class B shares. That's correct. But that we don't know whether Class B shares were still available to your client, or at least there's apparently a dispute about that because it remains unclear whether the bylaws which you cite in the complaint remain in effect. That's correct. Okay. And just briefly finishing up on Rule 191, as an example, Carl submitted an affidavit of Dr. Moberg's affidavit with an exhibit, A2, and it's an acceptance agreement that our client, who now has mental problems because of his disability, we weren't even able to depose him on. But when you look at that agreement, which is on the appendix at page 83, his signature has been cut and pasted into the acceptance agreement. Now, we were not even able to depose anybody. We were asked to talk about it. When you look at the document, appendix 83, the appendix signature has been cut and pasted into the document. It's apparent. When you match it up, yet we wanted to depose these individuals and talk to them about that, but we were denied the right to take the deposition. What did the court say about denying that? What explanation were you given? There was no notice given on that hearing, Your Honor. We didn't even know that it was going to be argued. We just got a written order. What do you contend the affidavits would show if you were permitted to testify or obtain them? Well, that's our difficulty. We are in somewhat of a disadvantage here because my client has mental problems, memory problems and whatnot, but we would certainly dispute that that affidavit that contains his signature is not how it appeared when he is alleged to have signed it back in 1992. On its face you can see where they cut and pasted that in there, but we would suggest that if he did sign it, it wasn't in that form. Well, the rule requires that you have to state what the affidavit believes they were testified to. We believe that that is a false document, that the document did not appear that way, so this allegation that he signed that document, that acceptance agreement, we believe is false. And it is true. I did not include that in our document because Dr. Kinney has no memory whatsoever. Well, you know this now. Why didn't you tell the court? We didn't know that it was going to be argued. We didn't have notice of the ruling. He was going to rule in 191. We weren't noticed up on that. That means you weren't noticed on it. We didn't argue that in the lower court. We had no advanced knowledge that that issue was even going to be argued. We cite that in our brief. Well, I don't understand. You filed a motion to seek discovery of these people? Yes. And they filed a motion to do what? To bar you saying you didn't comply? They filed a motion to strike, and we were not aware that the motion to strike was even going to be heard or ruled upon. What we did do is we argued a motion to dismiss. So we had no notice or knowledge that our motion was even going to be heard. So the hearing was on the defense motion to dismiss, and at that hearing they called up their motion to strike your request for discovery deposition of these people? The motion to strike our affidavit submitted by Dr. Katanik, and the court ruled on it. You have David requesting continuance? Well, it was our motion to strike and our motion to be allowed to take depositions under Rule 191. Well, if you had been given notice, what would you have said? You either have complied with 191B or you haven't. Your Honor, I think that in this situation we marginally complied, but admittedly when you read the plain language, I think I probably didn't comply if you strictly interpret that rule. Well, that's what the Supreme Court suggests. If it's liberally interpreted, I think we did. So you think your position is there was this document from 1992, and you claim that the signature which purports to be your client's isn't? No. I say that somebody, you can see where on the page, on the exhibit, they cut that signature out and pasted that onto the page. You can see that in the document. You can see that the type doesn't match up throughout the document. So where his name is typed, Dr. Katynik, the size of that type doesn't even match what is... Right. But if this, just speculating for a moment... Sure. If this is a standard document for lots of different physicians, I can see where they might have occasion to type the name of the particular physician on a standard document, and then have someone sign it, showing the way doctors sign their names. You want to have it typed up so you can tell whose name it is, with nothing more to do than that. So if your position is, hey, look, the type is different, I'm not sure there's any inference to be drawn from that. Well, our position would be we wanted to take the deposition of the affidavits to determine... So their affidavits are not true... That's correct. ...that this document was signed by Dr. Katynik. That's correct. And you're going to ask them that, and they're going to say, yeah, that's right, we lied. But where are we going with this deposition? Well, where I'm going is they're arguing that he accepted the agreement and signed that document. And we don't know that that's true at all. We know that that document that they have submitted as part of an attachment is not what we believe he signed. Now, granted, he's now, it's not a stroke that he's disabled from, but he had a major event, so... What is this condition? What do you mean? He's disabled. His memory is gone. He clearly, he can't remember even many of the most basic things. But, for example, you could ask him about his children, and he'd know their names. But there's no dispute, he is disabled. That's the problem... From a stroke, you said? Well, it's not a stroke. It was a neurological event. And I think he'd been to Mayo and everybody else, but they haven't really been able to tell us what the condition is. But it impairs his brain. And he's disabled. Part of which is the problem with the 191 affidavit is he can't verify and say, well, what do you expect these people to say? He has trouble, you know, with normal activities of daily living, let alone being able to say what those individuals would say and what they expect to testify to. Clearly, we think that the affidavit was changed. Give me the timeline here again. I'm not sure I understand this. He becomes disabled, acquires the clinic, therefore he is no longer a Class A shareholder. When was this done? August of 2008, he becomes disabled, clearly. October 20th, I think it's 20th, 22nd, 2008, there's a clear determination. They send the letter that's in the briefs, you are disabled. They were supposed to, within 30 days from that time, then tender an offer to repurchase you. Who sent the letter? Well, nobody sent the letter because it didn't occur. The insurance company. The insurance company makes a determination that he's fully disabled. Yes. And we're going to give him insurance coverage for his disability. Yes. That happened in October of 2008? Yes. So they send that to Dr. Katenek, and do they send that to Carl Clinic too? Yes. So the clinic is on notice, this guy is not disabled. Yes. What next does the clinic do? Nothing happens until the offer from Carl Foundation comes about. They don't offer. When was that? That was in the fall, November of 2009. So, 13 months later? 13 months later. And then in January, after this lawsuit has been contemplated, and I don't know the exact date we've initially filed, January of 2010, they issue him, they send him a check offering to repay the $48,000. So it's... So there's no dispute, $48,000 is what he would have been due in October 2008? That's correct. And no one did anything, including Carl, for 13 months? That's correct. And then there's this merger, and suddenly his stock is worth a lot more, and now they're apparently trying to clean up the books. Yes. At the merger, during the pending merger, our plan was to say, well, if you're still a shareholder, why aren't you getting the notices? And that's when I show up on the scene, and we try to get this resolved, and then they say no, and that's what brought us to the lawsuit. So it's not correct to say that he had not been a shareholder since April 20, 2009? No, we believe he was a shareholder and continues to be a shareholder. The court obviously ruled that he was not a shareholder, and the court said that they breached and they basically had to pay him the $48,000. Thank you, Your Honor. Thank you, counsel. Your Honor, if it pleases the court and counsel, there are some misconceptions about the dates, I think, that have just been said. Please. I hope I've been clear. Dr. Kotenek was disabled in August of 2008. That was his last day of work. And he had then applied for his long-term disability insurance at the end of August 2008. On October 17, the Hartford, which is the long-term disability carrier for Crow Clinic Association, sent a letter approving his long-term disability insurance coverage, or his eligibility coverage. Now, that would be the determination in October of 2008 that would kick in Section 2.3? That's correct. Okay. But 2.3, upon which Dr. Kotenek relies, says that after you get that notice from the long-term disability carrier, then you must not be healthy enough or able to work for a period of six months. And then at the end of that six-month period, you are, in fact, totally and permanently disabled from Crow Clinic Association. That's where the April 2009 date comes in. So, if I understand correctly, you interpret 2.3 as requiring two thresholds. The first is the determination of disability and then seeing about six months later? That's correct. For example, the Hartford makes the determination that Dr. Kotenek is disabled pursuant to his condition at that time. But the bylaws of Crow Clinic Association then says, you have short-term disability insurance, which you're receiving from Crow Clinic. But there's an elimination period, as it's referred to in the Hartford policy. So you go another six months. And if your condition doesn't change for the better, you're not able to get back to work or whatever the circumstance might be, at the end of that six-month period, then according to 2.3, upon which they rely, he is totally and permanently disabled as of April 20, 2009. And that's the time when the money should have been due to Dr. Kotenek. And the clause reads, shall relinquish his slash her right to hold Class A shares at that point? That's correct. At the six-months point? That's correct. Okay, so at that point, he shall relinquish his shares. He's also entitled to his money. That's correct. And Carroll didn't pay? They did not. Well, that's not a good thing. No, they should have paid pursuant to their bylaws at that point. But pursuant to the bylaws that we've been discussing, and we all rely on them at this point. And if I may, I'd like to circle back around and just clarify one other thing that Dr. DePlura mentioned about the acceptance agreement that we were talking about. That acceptance agreement says that Dr. Kotenek, should he sign upon becoming a shareholder, he accepts the terms and conditions of the Articles of Incorporation and the bylaws and the rules and policies of Carroll Clinic Association for whom he's employed. If it's suspicious in any way, it's not really a significant issue in the case, because frankly, he was an employee of Carroll Clinic Association, and we all agree that the bylaws are a contract and an obligation between the parties, or mutual obligations between the parties. So there's not much mystery about it. He agreed to accept them back when he got his shares. Whether it looks appropriate to the attorneys or not, in any event, it's of no moment because, in fact, the bylaws bind both the parties in this case. So your position seems to be that the Kotenek's argument to us is he was clearly operating as a member of Carroll Clinic and subject to the bylaws, and so what's the issue? Yes. Well, what is the issue? Well, I don't think it is an issue at all. Well, he can be an employee. I mean, you could have an agreement about the guy being an employee without all the fine technical terminology here, which is what you're hearing. You could have, indeed. In fact, many places do have separate employment contracts, as I'm sure the court is aware. In this particular case, there wasn't a separate employment contract, just an agreement to abide by the bylaws and rules of the organization. So that's what happened. The brief refers to the failure to pay in April. Yes. As de minimis and inadvertent. You know, this sounds like some professional people with bylaws, sophisticated transaction later that makes these shares worth an awful lot of money. From April to January is inadvertent and de minimis? I mean, that's when the check is. That's when the check was. January of the following year. Yes, the check was cut in November of 2008, I believe, but it was actually sent to him in January of the following year. That's correct. Well, wait a minute. Why would you write a check in November if the six-month period wouldn't expire until April of the following year? No, I've misled you, if that's what you think. I'm talking about 2010. In April of 2008, that's when the clinic believes the disability occurred. The check was written in November of 2008. That's when an initial letter from the clinic administration went to Dr. Potenik and said, We don't have your share certificate. Please bring it in, and we'll tender the check to you at that point. That was 30 days after the determination of disability? More than 30 days. More than 30 days. But it still hadn't reached the six-month mark. I misled you totally, if that's what we're thinking. He was disabled in 2008. Yes. In April of 2009, by the clinic bylaws, he would have been disabled pursuant to the six-month rule. Right. And then in November of 2009, that's when the first letter. Oh, but you said November of 2008. I probably did, and if I did, I would have misled you. The check isn't sent to him until January of 2010. That's correct. So it's five months late. Well, no, it's seven months late before the check is cut, and another two months before. That's correct. And if your interpretation is correct about the bylaws being automatic, you didn't need to wait for him to tender you some documents about shares? No, that's true. They didn't need to. They're custom and practice, as they said in the affidavits, that it was informal. They would notify the physician. The physician would come in typically to the administrative office, hand off the shares, and get the check in that particular case. Maybe that says something about the health care system. Just drop by and get your $50,000 check whenever it's convenient for you. Maybe we'll cut it. Maybe we won't. But when we do, we might get it mailed a couple months later. And whether that's so or not, Dr. Kotinik, on his own, being a disabled person, didn't come in and deliver the shares in any event, since the clinic and the bylaws provide that it was an automatic termination. And without more, they didn't need to do anything. They owned the shares. But about on that point, it's automatic termination without more at the end. Counsel's argument that, well, he could have tried to move them from shareholder A to shareholder B. Sheriff, is he correct? He is not correct with respect to that. Even on the version of the bylaws that he attached to his complaint, Section 2.3 says there's an exchange for Class B shares in the amount suggested in Section 7.3.2. So that 2.3, even on his example, is tied to yet another Section 7.3.2. On his bylaws, when you go to 7.3.2, it's not there. It's reserved. It was repealed even before that. So there are no Class B shares, even as of the time of the bylaws that he's provided to the court. And Judge Jones at the trial court noticed that and asked for an explanation. There is no explanation, except that there are no Class B shares. And the Class B shares are something of a red herring in that regard. We tendered the affidavits of Dr. Mulberg, Mr. Hesch, the CFO, and the Administrative Secretary. The discussion earlier made it seem as if Carl had just amended those bylaws. In fact, those bylaws, 2.3, were amended before Dr. Kotenek ever became disabled in January of 2008 and took out the Class B share designation. So it didn't exist. The bylaws that we tendered were the bylaws in effect at the time of Dr. Kotenek. When did that amendment occur, did you say? January 2008. Dr. Kotenek became disabled in August of 2008. So eight months, seven or eight months after the amendment had occurred, the Class B shares were no longer in existence. So there were no Class B shares. No. This was discussed at the trial court? Yes. And the affidavits presented by your people concerning the bylaws contained all the bylaws and showed that there were no Class B shares. That's correct. So the dispute here appears to be Carl didn't pay what was due when it was due, and what is the consequence of that? Yes, I think that's correct. He says you've breached everything, and he's entitled to hold on to these shares and get the new money, and your position is what? We say we didn't pay in a timely way. That was wrong. We tendered the money. It was not accepted by Dr. Kotenek, but our position was the money is the money that the contract provided at the time that the shares came back to Carl. We didn't pay you in a timely way. You're entitled to your $48,000 plus, and you would be entitled to. Plus what? Plus interest. Oh, so they tendered interest too? Yes. I think they're entitled to interest. Did you tender interest? We did not tender interest, but we discussed it and offered it in the trial court and referenced it in our pleadings that they would be entitled to that. So you're happy to give him his money and interest, and you just say that's all he's entitled to? That's correct. What we say is that you're not a shareholder. It would be nice if you were a shareholder at the time that some subsequent event happened which raised the rate. The shares were retired for cash and debt at the time of the closing. That's not part of the record, by the way, but that's what happened. But this isn't an option. If you don't get your money within that 30-day period, it doesn't create an option to make a request at some future time. What about the analogy that you used to compare, you know, this is like you're selling a house, but you never paid for it, and suddenly you discover gold under the house. The contract was breached, and we're now entitled to the benefits. In the analogy, as I understood it, the house wasn't actually sold. It was an executory contract. In this case, the shares transferred automatically. That was done. So the issue was you're no longer a shareholder because you cannot be a shareholder. You're not a professional person anymore. By the way, pausing right there, and I want you to get back to your point, but I was under the impression that, in fact, under the Medical Practice Act or some such thing, in order to be a shareholder of a medical clinic, you have to be a physician in the clinic. Correct. That's correct. So, I mean, is Section 2.3 reflective of what the Illinois law otherwise requires? You and I, not being members of Cairo Clinic, can't own shares in Cairo Clinic. That's correct. Under the Professional Corporation Act, only certain kinds of professionals can affiliate, and those kinds of professionals are physicians, optometrists, psychologists, I believe, and they can join a professional corporation and do business together. But if you're not a professional or you're not working at the corporation, you can't be an owner in it. So does this include people who might have been affiliated with the clinic and retired? Yes. They can no longer continue to be shareholders? They cannot, no. Now, they could be hired back, perhaps, if they were still licensed to practice part-time on a contractual basis. But they can't be shareholders? That's correct. An effort to continue them as shareholders would be in violation of the professional, what is it? The Professional Corporations Act. But, yes, that's the way it works. If you look at our brief, there is a logic to these bylaws. It starts with 2.1. That's the section that tells what the qualifications are, and that's essentially what we're talking about. You must be a professional person. You must be licensed. I'm sure Dr. Kotenek is still licensed, but, as counsel says, he's just simply not able to perform his professional options. So 2.1 says you must be qualified. If you're not, you can't be a shareholder. And then 2.3 says here are the qualifications for when you become disabled, and if you're totally and permanently disabled, you shall not be a shareholder. And then 7.3.1, which is the linchpin that says once you become totally disabled, then your shares become owned without more by the corporation, and then the corporation owes you money for your shares as computed by Section 7.5, which is the formula, and then, oh, that money, it must be paid within 30 days. And it's that last piece that didn't get done by Carl's administration. What happens if this court affirms the trial court? The case would be dismissed at that point. Carl would tender again the $48,000 plus interest on the $48,000. If I understand correctly, your position is there are no disputed issues affected? I do dispute the interpretations of some of the bylaws sections, 2.3 in particular, and the Class B issue. But that aside, I do agree he's disabled. I do agree that the bylaws provide the contract. The sequence of events is all in agreement? Except I think he believes that the disability occurred in October versus my conclusion that it occurred in April of 2009. Well, but the sequence of events is in October he was sent this letter, and in April it's your sentence. That's the final date under the bylaw. To the extent there's any factual disagreements, it's his arguments that the appearance of the bylaw signature suggests it's bogus. What's your position on all that? Well, as I'd probably be distracted the court by, I don't think the signature on that document means anything at all. It just simply means he's an employee of the organization and agrees to follow its rules. And I think we'll probably all agree that that's the case because he wants to rely on the bylaws as the contract providing the rules for him. That's what his client is signing off on. As to the 191 issue, in Champaign County, when a motion to dismiss is filed, the judge sets a scheduling order. And so Mr. Plura then responded to my motion to dismiss, and in that he filed his 191 motion with respect to Dr. Kotinik, along with Dr. David. He was not allowed to file my response immediately after that, before the actual hearing. And that's when I filed a memorandum objecting to the 191 as being inappropriate and also filed the motion to strike. So it's all in the context of that hearing occurring. So that was all in front of the court, in front of counsel, and then we had our hearing seven days after I made my filing. And the court considered that, and it was my technical objection to the affidavit where they weren't able to say what it was they expected these depositions to demonstrate. So as your position, 191B wasn't complied with and the trial judge agreed? And he did. Did Dr. Plura at that time ask for a continuance of the hearing? He did not. No further questions. Thank you, thank you. Rebuttal? I'm happy to answer any questions. I really enjoy coming down here, and it's a refreshing break for me. If there's no questions, I'm happy to let the court decide. Thank you.